UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------x
JOHN KUNZLER,

                 Plaintiff,        <u>MEMORANDUM & ORDER</u>
                                      19-CV-07181(JS)(ARL)

   -against-

DENIS MCDONOUGH, SECRETARY,
DEPARTMENT OF VETERANS AFFAIRS,

                 Defendants.
--------------------------------x
For Plaintiff:     John Kunzler, <u>pro se</u>
                 24 Pheasant Lane
                 East Setauket, New York  11733

For Defendant:     Nathaniel Michael Putnam, Esq.
                 Assistant United States Attorney
                 157 Church Street, 24th Floor
                 New Haven, Connecticut  06510

SEYBERT, District Judge:

        <u>Pro se</u> plaintiff, John Kunzler ("Plaintiff"), commenced this action against defendant, Denis McDonough, the Secretary of the United States Department of Veterans Affairs (the "Defendant"), asserting claims of discrimination, retaliation and hostile work environment pursuant to the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. §§ 701 <u>et seq.</u> Presently before the Court are the parties' cross-motions for summary judgment. (<u>See</u> Def. Motion, ECF No. 45; Pl. Cross-Motion, ECF No. 53.)  For the reasons that follow, Defendant's Motion is GRANTED, and Plaintiff's Cross-Motion is DENIED.

<u>BACKGROUND</u>

I.   <u>Factual Background</u>[1]

   A.   <u>Employment History</u>

      Plaintiff was honorably discharged from the United States Coast Guard in 2000 with a service-related disability of "permanent paralysis of [the] lower right leg, spinal stenosis, spine injury, and neuropathy and radiculopathy in the right leg." (Pl. Aff. ¶ 2; Pl. 56.1 Response ¶ 10.)  In June 2011, Plaintiff began working for the Northport Veterans Affairs Medical Center (the "VA") as a Housekeeper in the Environmental Management Services division ("EMS").  (Def. 56.1 Stmt. ¶ 1.)  In October 2012, Plaintiff was promoted to the position of Heavy Equipment Operator in the EMS's Grounds Department ("Grounds Department"). (Pl. Aff. ¶ 4.)

---

[1]  The following facts are drawn from: the parties' Local Rule 56.1 Statements, Counterstatements, and Responses; corresponding supporting evidence; and, the Court's independent review of the record.  (See Def. 56.1 Stmt., ECF No. 46; Pl. 56.1 Response, ECF No. 53 at ECF pp.14-70 (with duplicate filed at ECF No. 53 at ECF pp. 114-170); Pl. 56.1 Stmt., ECF No. 53 at ECF pp. 71-88; Def. 56.1 Counter-Stmt., ECF No. 58-1.)
      Defendant's exhibits are identified by numbers "1" through "25" (see ECF Nos. 47-1 through 27-24, and ECF No. 58-2), which are attached to the Declaration of Defendant's counsel, Assistant U.S. Attorney Nathaniel M. Putnam (see ECF No. 47), and Defendant's Reply (see ECF No. 58).  Plaintiff's exhibits are identified by letters "A" through "P" (see ECF Nos. 53-1 through 53-17), which are attached to Plaintiff's Affidavit (see ECF No. 53 at ECF pp. 3-13).  Hereafter, and unless otherwise noted, the Court will reference exhibits by their respective number or letter only. Relatedly, for ease of reference, the Court cites to the Electronic Case Filing System ("ECF") pagination.

Gerard Foerst ("Mr. Foerst") is the head supervisor of the Grounds Department, which consists of approximately twelve individuals, and has been Plaintiff's first-line supervisor since March 16, 2016. (Def. 56.1 Stmt. ¶¶ 2-3.) Annette Baker Cassidy ("Ms. Cassidy") was the Assistant Chief of EMS and was Plaintiff's second-line supervisor from prior to December 2016 until she retired in late 2018 or early 2019. (Id. ¶ 4.) Uingston Markes ("Mr. Markes") is the Chief of EMS and has been Plaintiff's third-line supervisor since prior to 2016. (Id. ¶ 5.)

On December 12, 2016, while working in the Grounds Department, Plaintiff suffered an injury to his neck and mid-back lifting a 100-pound barrel of tar onto a pallet that resulted in him being placed on "light duty" until April 2018 when he returned to "full duty" status. (Pl. 56.1 Stmt. ¶ 8; Pl. 56.1 Response ¶ 17.) Plaintiff testified his work-related injury did not "exacerbate[]" his service-related injury but that it was "all part of it." (Pl. 56.1 Response ¶¶ 11-12.) Prior to his December 2016 work-related injury, Plaintiff was able to perform all the duties and tasks required of a Heavy Equipment Operator in the Grounds Department, including lifting and carrying heavy objects. (Def. 56.1 Stmt. ¶ 15.) Plaintiff testified that all three of his supervisors were aware of his work-related injury; however, he does not know whether any of his supervisors had any knowledge of his service-related disability. (Id. ¶ 18.) Plaintiff's three

3

supervisors all attest that they were unaware Plaintiff had any disability. (Pl. 56.1 Response ¶ 21.)

According to Plaintiff, sometime in March 2017, and on two other occasions, Mr. Foerst questioned Plaintiff in the presence of his co-workers about his light-duty status. (Pl. 56.1 Stmt. ¶¶ 15-17; Pl. 56.1 Response ¶ 32.)

B.   Plaintiff's Arrest

According to Mr. Foerst, prior to March 30, 2017, Plaintiff's supervisors perceived there to be a theft problem in the Grounds Department of the EMS. (Def. 56.1 Stmt. ¶ 34.)   For example, a few months prior to March 2017, there was a missing air gun from a communal toolbox.   (Id. ¶ 35.)   After Mr. Foerst expressed his concern about the missing air gun to his employees, it suddenly returned to the toolbox.   (Id.)   Further, Mr. Foerst was concerned about theft at the VA based upon Grounds Department employees being freely authorized to go to the supplies department and request and receive any supplies needed to do their job without any formal accounting.   (Id. ¶ 37.)   Additionally, many of the Grounds Department employees performed side jobs outside their work for the VA that required the same equipment or supplies that were freely available to them at the VA, which is a large complex, thereby making it easy for employees to engage in theft without getting caught.   (Id.)   In that vein, since 2015, Plaintiff has owned his own business, AM Vets of America, LLC, through which he

4

does side jobs, including light-construction work, and building and land maintenance, outside of his work with the VA.  (Id. ¶ 38.)

On March 30, 2017, from his office window, Mr. Foerst observed Plaintiff carrying a large box of government supplies worth $134.27 outside of the building.  (Id. ¶¶ 40, 43.)  According to Mr. Foerst, he: (1) then went outside and observed the same box of VA supplies in the front seat of a contractor's truck; and (2) thereafter, contacted the VA police because he believed Plaintiff was trying to steal the supplies.  (Id.)  The VA police arrested Plaintiff, charging him with petit larceny, which charge was later dismissed.  (Id. ¶ 42, 44; Pl. 56.1 Stmt. ¶ 55.)  Subsequently, Plaintiff was issued a notice of proposed removal based on a charge of "conversion".  (Pl. 56.1 Stmt. ¶ 26.)  Plaintiff claims he never admitted to stealing nor signed a confession.  (Id. ¶ 48.) According to Plaintiff, when he was arrested, Mr. Foerst had to be restrained by a police officer from attacking him.  (Id. ¶ 19.) Mr. Foerst denies this allegation.  (Foerst Suppl. Aff., ECF No. 58-1, ¶ 1.)

On July 27, 2017, Plaintiff's March 31, 2017 notice of proposed removal for "conversion" was rescinded and replaced with a notice of proposed removal charging Plaintiff with "unauthorized possession."  (Def. 56.1 Stmt. ¶ 49; Def. Ex. 8.)  On August 18, 2017, Plaintiff received a notice of suspension, explaining his

notice of proposed removal for the March 30, 2017 incident had been reduced to a 14-day suspension. (Id. ¶ 50.) Plaintiff served his suspension from August 27, 2017 to September 9, 2017. (Id.)

C.   Post-Arrest: From March 31, 2017 through September 11, 2017

Following the March 30, 2017 incident, Plaintiff was temporarily reassigned to work in the EMS office under the supervision of Ms. Cassidy until September 11, 2017. (Id. ¶¶ 51, 55.) There is a dispute whether Plaintiff requested reassignment because Mr. Foerst was "acting irrationally and Plaintiff was afraid for his safety" (Pl. 56.1 Response ¶ 51), or whether Mr. Markes reassigned Plaintiff during the ongoing investigation because he was concerned there was a risk of an altercation between Plaintiff and Mr. Foerst. (Def. 56.1 Stmt. ¶ 52.)

During his time under Ms. Cassidy's supervision, Plaintiff was "assigned a variety of menial duties, including, but not limited to, cleaning bathrooms with what was essentially a toothbrush, cleaning wheelchairs, cleaning elevators and picking up garbage on the side of the road." (Def. 56.1 Stmt. ¶ 62.) According to Plaintiff, Mr. Foerst directed his assignments even though he worked under Ms. Cassidy's supervision. (Pl. 56.1 Response ¶ 57.) Plaintiff never complained to Ms. Cassidy or any of his other supervisors about the tasks he was assigned from March 2017 through September 2017. (Def. 56.1 Stmt. ¶ 66.)

On or about May 9, 2017, Mr. Foerst questioned Plaintiff about a missing weedwhacker that had been issued to him and had last been seen inside Plaintiff's padlocked locker. (Id. ¶¶ 59-60.) During the questioning, in the presence of a co-worker, Mr. Foerst also asked Plaintiff whether Plaintiff had filed an Equal Employment Opportunity ("EEO") case against him. (Id.; Pl. 56.1 Stmt. ¶ 50.)

D.   Post-Suspension

In September 2017, after his suspension was concluded, Plaintiff returned to work in the Grounds Department under Mr. Foerst's direct supervision. (Def. 56.1 Stmt. ¶ 76.) Plaintiff claims that, at that time, Mr. Foerst required Plaintiff remove poison ivy by hand. (Pl. 56.1 Response ¶ 77.) Defendant denies this but admits Plaintiff was assigned to clear brush and weeds from the VA's water tower. (Def. 56.1 Stmt. ¶ 78.)

According to Mr. Foerst, at some point in 2017, he instituted a policy change for all Grounds Department employees, i.e., they were no longer permitted to use the VA pickup trucks unless the specific task to which they were assigned required use of such a vehicle; otherwise, employees were instructed to use golf carts to get around the VA complex. (Id. ¶ 143.) Plaintiff claims that in December 2016, Mr. Foerst required Plaintiff to use a golf cart instead of a pickup truck. (Pl. 56.1 Response ¶ 147.)

On September 13, 2017, Plaintiff was sent to the Nutrition and Food Department for an interview to determine whether he could work in the kitchen. (Pl. 56.1 Stmt. ¶¶ 70-71.) Plaintiff did not want to work in the kitchen (id. ¶ 72), and claims Mr. Foerst sent him there to do dishes. (Pl. 56.1 Response ¶ 84.)

In October 2017, Plaintiff was assigned to perform the Grounds Department's courier duties, including making deliveries and pickups between the Northport VA's main campus and its various Community Based Clinics ("CBC"). (Def. 56.1 Stmt. ¶ 85.) Plaintiff preferred the courier role to his prior duties as it kept him out of the VA office but claims he was never trained for this role. (Pl. 56.1 Response ¶¶ 88, 93.) Though the idea of instituting training for this role was discussed, there was no formal training for it at that time. (Def. 56.1 Counter-Stmt. ¶ 77; Pl. 56.1 Response ¶¶ 94-95.) On October 24, 2017, Plaintiff received a notice of proposed removal for issues he was having in this new role. First, Plaintiff refused to take certain boxes of supplies and make certain deliveries because he believed delivering supplies and packages was not in his job description. (Def. 56.1 Stmt. ¶¶ 101, 105, 109; Pl. Aff. ¶ 54.) Then, on October 12, 2017, when Plaintiff picked up two labeled bags from the VA pharmacy to be delivered to two different CBCs, he mixed the bags up, delivering each to the wrong CBC location. (Def. 56.1 Stmt. ¶ 106.) Even after the notice of proposed removal was

8

issued, Plaintiff's supervisors continued to hear complaints from staff that Plaintiff was refusing to help with certain deliveries. (Id. ¶ 107.)

On November 3, 2017, a VA nurse emailed Mr. Foerst and Ms. Cassidy about issues with deliveries and suggested additional training for Plaintiff. (Pl. 56.1 Stmt. ¶ 82.) According to Ms. Cassidy, once she explained to Plaintiff the courier's duties, she had no more problems with his deliveries. (Pl. 56.1 Response ¶ 107.) On November 16, 2017, Plaintiff's notice of proposed removal was reduced to a letter of reprimand. (Pl. 56.1 Stmt. ¶ 86.)

In late 2017 or early 2018 Plaintiff was subjected to a fact-finding hearing before Ms. Cassidy after he failed to deliver nail clippers to a CBC for its podiatry patients. (Def. 56.1 Stmt. ¶¶ 114, 115.) Ultimately, Plaintiff was not disciplined for the incident. (Id. ¶116.) Since that time, Plaintiff has continued to perform the Grounds Department's courier duties and has not been subjected to discipline, reprimand or any fact-finding; nor has he received any further notices of proposed removal. (Id. ¶ 121.) However, in 2019, VA personnel discussed contacting the VA police for an alleged HIPAA violation and for mail tampering allegations made against Plaintiff. (Pl. 56.1 Response ¶¶ 121-23; Pl. 56.1 Stmt. ¶¶ 103-05.)

In Winter 2018 or 2019, Mr. Foerst refused to purchase new work clothes for Plaintiff as he had previously done for the

Grounds Department employees because, as a courier, Plaintiff did not need protective clothing. (Def. 56.1 Stmt. ¶¶ 140-41.) However, Mr. Foerst did purchase work boots for Plaintiff. (Id. ¶ 141.) According to Plaintiff, Mr. Foerst also purchased gloves and other outdoor personal protective equipment for non-Grounds Department employees. (Pl. 56.1 Response ¶¶ 140-41.)

   E.   Performance Appraisals

   Prior to 2017, Plaintiff consistently received performance ratings of "exceptional" and "fully successful" from his supervisors. (Pl. 56.1 Stmt. ¶¶ 1-6.) On October 6, 2017, as Plaintiff's direct supervisor, Mr. Foerst initially appraised Plaintiff's yearly performance, i.e., from October 1, 2016 through September 30, 2017, as "unacceptable" and assigned him a rating of "minimally satisfactory". (Id. ¶¶ 7, 87; Def. Ex. 14.) Mr. Foerst's comments addended to Plaintiff's performance review stated that Plaintiff had been "arrested and confessed to stealing government property" and was "suspended two weeks for stealing". (Pl. 56.1 Stmt. ¶¶ 7, 87; Def. Ex. 14.) On October 11, 2017, as Plaintiff's second-level supervisor, Ms. Cassidy overruled Mr. Foerst's ratings, changing Plaintiff's appraisal rating to "fully successful". (Def. 56.1 Stmt. ¶ 99.)

   Plaintiff continued to receive annual performance reviews with a rating of "fully successful" (which is the lowest successful rating) rather than "excellent" or "outstanding".

(Def. 56.1 Stmt. ¶ 125; Pl. 56.1 Response ¶ 125.)  At some point in 2018, the Acting Associate Director of the Northport VA complained too many employees were being rated "outstanding" on their performance reviews.  (Def. 56.1 Stmt. ¶ 126.)  In response, Mr. Markes and Mr. Foerst saved "outstanding" reviews for employees who only went above and beyond their job responsibilities.  (Id. ¶¶ 126, 128.)  This caused discontent among many employees, including Plaintiff, who no longer received "outstanding" performance reviews.  (Id. ¶ 126.)

    F.    2017 EEO Complaint

        On June 7, 2017,[2] Plaintiff filed a formal EEO complaint against Mr. Foerst alleging a hostile work environment.  (Pl. 56.1 Stmt. ¶¶ 37-38, 48; Pl. Ex. J.)  He amended his EEO complaint on August 25, 2017.  (Pl. 56.1 Stmt. ¶ 60.)  Ms. Cassidy contends she had no knowledge of Plaintiff's EEO complaint against Mr. Foerst. (Def. 56.1 Stmt. ¶ 64.)

        On May 23, 2018, the Equal Employment Opportunity Commission ("EEOC") issued a final decision on Plaintiff's 2017 EEO charge finding Defendant did not discriminate against or subject Plaintiff to a hostile work environment.  (See EEOC Sept. 25, 2019 Decision on Appeal (affirming EEOC's May 23, 2018

---

[2] Plaintiff had previously initiated contact with an EEO counselor on May 5, 2017.  (Pl. 56.1 Stmt. ¶¶ 37-38, 48; Pl. Ex. J.)

Decision), <u>attached to</u> Amend. Compl.)  That decision was affirmed on appeal.  (<u>See</u> <u>id.</u>)

    G.   <u>2018 EEO Complaint</u>

On March 19, 2018,[3] Plaintiff filed a second EEO complaint, this time alleging discrimination, hostile work environment, and retaliation by Ms. Cassidy and Mr. Markes.  (Pl. 56.1 Response ¶ 117; Def. Ex. J at 16-19.)  The EEO charge specifically references Plaintiff's: October 2017 performance review; assignment to menial tasks; October 24, 2017 notice of proposed removal; and, nail-clipper-related fact-finding hearing. (Def. Ex. 11; Pl. Ex. J at 14-19.)  On June 4, 2019, the EEO issued a final agency decision.  (Pl. 56.1 Stmt. ¶ 120.)

II.  <u>Procedural Background</u>

On December 23, 2019, Plaintiff filed a Complaint in this Court, which he amended on December 14, 2020.  (<u>See</u> Compl., ECF No. 1; Amend. Compl., ECF No. 16.)  He seeks compensatory damages plus costs, disbursements, and attorneys' fees.  (Amend. Compl.)  On May 13, 2022, Defendant filed his summary judgment motion (the "Motion"). (ECF No. 45; <u>see also</u> Support Memo, ECF No. 45 at ECF pp. 2-27.)  On July 29, 2022, Plaintiff filed his opposition to Defendant's motion and cross motion for summary

---

[3] Plaintiff had previously initiated contact with an EEO counselor on October 30, 2017.  (Pl. 56.1 Response ¶ 117; Def. Ex. J at 16-19.)

judgment (the "Cross-Motion").  (ECF No. 53; <u>see also</u> Support Memo, ECF No. 53 at ECF pp. 89-113).  On September 19, 2022, Defendant filed a Reply in further support of his Motion and in opposition to Plaintiff's Cross-Motion.  (ECF No. 58.)  On October 11, 2022, Plaintiff filed a reply in further support of his Cross-Motion (the "Reply").  (ECF No. 59.)

DISCUSSION

I.   <u>Legal Standard</u>

Pursuant to Rule 56(a), "[a] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "A fact is 'material' for these purposes when it might affect the outcome of the suit under the governing law."  <u>Adamson v. Miller</u>, 808 F. App'x 14, 16 (2d Cir. 2020).  Additionally, "'[a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  <u>Id.</u> (quoting <u>Jeffreys v. City of N.Y.</u>, 426 F.3d 549, 553 (2d Cir. 2005)).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper."  <u>Hetchkop v. Woodlawn at Grassmere, Inc.</u>, 116 F.3d 28, 33 (2d Cir. 1997).  Moreover, "the court is not to make assessments of the credibility of witnesses" on a motion for summary judgment, as "[c]redibility

assessments, choices between conflicting versions of events, and weighing of the evidence are matters for the jury." Id.; see also generally Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 725 (2d Cir. 2010) (same).

On a motion for summary judgment the court considers "the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).  In reviewing the record, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  Sheet Metal Workers' Nat'l Pension Fund v. Vardaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).  When drawing inferences from evidence in the record in favor of the non-moving party, however, a court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts."  Berk v. St. Vincent's Hosp. & Med. Ctr., 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1318 (2d Cir. 1990)).

"Once the movant has 'demonstrat[ed] the absence of a genuine issue of material fact . . . the onus shifts to the party resisting summary judgment to present evidence sufficient to

satisfy every element of the claim.'" Pennington v. D'Ippolito, 855 F. App'x 779, 781 (2d Cir. 2021) (quoting Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008); alteration in Pennington). To do this, "[t]he non-moving party is required to 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" Id.

"The fact that both sides have moved for summary judgment does not guarantee that there is no material issue of fact to be tried and that one side or the other is entitled to that relief." Coutard v. Mun. Credit Union, 848 F.3d 102, 114 (2d. Cir. 2017). Instead, "'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" Id. (quoting Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir. 1981)).

The Court notes that, "particularly where motions for summary judgment are concerned," Jackson v. Fed. Express, 766 F.3d 189, 195 (2d Cir. 2014), it is "obligated to afford a special solicitude to pro se litigants." Tracy v. Freshwater, 623 F.3d 90, 101 (2d Cir. 2010). Nevertheless, pro se litigants are "generally . . . required to inform themselves regarding procedural rules and to comply with them." Wilson v. Suffolk County Dist. Att'y, No. 21-CV-4815, 2021 WL 4311155, at *2 (E.D.N.Y. Sept. 22,

2021) (quoting <u>Caidor v. Onondaga County</u>, 517 F.3d 601, 605 (2d Cir. 2008)).[4]

II.  <u>Disability Discrimination</u>

Defendant contends Plaintiff has failed to establish a <u>prima facie</u> case of discrimination on the basis of his alleged disability.  Defendant further argues, even if such a <u>prima facie</u> case were established, the record demonstrates that any adverse action taken against Plaintiff was based on legitimate nondiscriminatory reasons.  (Def. Support Memo at 8-24.)  The Court agrees.

---

[4] Plaintiff's response to Defendant's Rule 56.1 statement contains many assertions that "Plaintiff disputes this statement," and "the Court should disregard this statement."  (<u>See generally</u> Pl. 56.1 Response.)  This is not a sufficient response to establish a dispute of fact.  <u>See</u> <u>Ezagui v. City of N.Y.</u>, 726 F. Supp.2d 275, 285 n.8 (S.D.N.Y. 2010) (noting statements which a nonmovant does "not specifically deny-with citations to supporting evidence-are deemed admitted for purposes of [movant's] summary judgment motion") (collecting cases).  Local Rule 56.1(c) states the moving party's Rule 56.1 statement "will be deemed to be admitted unless specifically controverted," and requires that denials of purported undisputed facts be supported by specific citation to admissible evidence.  <u>Universal Calvary Church v. City of N.Y.</u>, No. 96-CV-4606, 2000 WL 1745048, at *2 n. 5 (S.D.N.Y. Nov. 27, 2000) (first citing Rule 56.1(c); then citing Rule 56.1(d)).  Accordingly, any of Defendant's Rule 56.1 Statements that Plaintiff does not specifically deny, with requisite citations to admissible evidence, are deemed admitted for purposes of Defendant's summary judgment motion.  <u>See</u> <u>id.</u> (citing FED. R. CIV. P. 56; Local Civ. R. 56.1) (collecting cases); <u>see also, e.g.,</u> <u>Butler v. Suffolk County</u>, No. 11-CV-2602, 2023 WL 5096218, at *19-20 (E.D.N.Y. Aug. 9, 2023) (discussing requirements of a Rule 56.1 statement, including having to specifically cite to admissible evidence to controvert a purported statement of undisputed fact).

Pursuant to the Rehabilitation Act, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a). Discrimination claims brought under the Rehabilitation Act, like claims brought pursuant to Title VII, are analyzed under the burden-shifting framework that the Supreme Court established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 793 (1973). <u>See</u> <u>Sista v. CDC Ixis N. Am., Inc.</u>, 445 F.3d 161, 169 (2d Cir. 2006); <u>see also</u> <u>Holcomb</u>, 521 at 138; <u>Carby v. Holder</u>, No. 11-CV-5775, 2013 WL 3481722, at *8 (S.D.N.Y. July 10, 2013). That framework requires a plaintiff to first establish a <u>prima facie</u> case of discrimination, after which the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. <u>Holcomb</u>, 521 F.3d at 138. Once the defendant provides such a reason, "the burden shifts back to the plaintiff to demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." <u>Leibowitz v. Cornell Univ.</u>, 584 F.3d 487, 499 (2d Cir. 2009) (internal quotation marks and citations omitted).

17

To establish a <u>prima facie</u> case of discrimination under the Rehabilitation Act, a plaintiff must show: (1) he is a disabled person under the Act; (2) he is otherwise qualified to perform his job; (3) an adverse action was taken against him because of his disability; and (4) the employer is a recipient of Federal financial assistance. <u>Heilweil v. Mt. Sinai Hosp.</u>, 32 F.3d 718, 722 (2d Cir. 1994) (citations omitted).[5] "An adverse employment action is a materially adverse change in the terms and conditions of employment." <u>Mathirampuzha v. Potter</u>, 548 F.3d 70, 78 (2d Cir. 2008) (quoting <u>Sanders v. N.Y. City Human Res. Admin.</u>, 361 F.3d 749, 755 (2d Cir. 2004)). Such action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." <u>Brown v. City of Syracuse</u>, 673 F.3d 141, 150 (2d Cir. 2012) (citing <u>Joseph v. Leavitt</u>, 465 F.3d 87, 90 (2d Cir. 2006)). "Examples of materially adverse employment actions include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material

---

[5] "Though there are 'subtle differences' between the ADA and the Rehabilitation Act, we generally 'treat claims under the two statutes identically,' applying the same standards to both." <u>Killoran v. Westhampton Beach Sch. Dist.</u>, No. 22-0204, 2023 WL 4503278, at *2 (2d Cir. July 13, 2023) (quoting <u>Henrietta D. v. Bloomberg</u>, 331 F.3d 261, 272 (2d Cir. 2003) (citation and internal quotation marks omitted)); <u>see also</u> <u>Rodriguez v. City of N.Y.</u>, 197 F.3d 611, 618 (2d Cir. 1999) (holding the ADA and the Rehabilitation Act "impose identical requirements").

responsibilities, or other indices . . . unique to a particular situation.'" Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004) (citations omitted). However, it is not enough for a plaintiff to demonstrate that he suffered an adverse action; he must also offer evidence showing any such action occurred "under circumstances giving rise to an inference of discrimination." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000). Such an inference may be drawn, for example, where an employer has made "invidious comments about others in the employee's protected group" or where an employer has exhibited "more favorable treatment of employees not in the protected group." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001) (citation omitted). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)).

Here, Plaintiff claims he was discriminated against due to his disability when he was: (1) arrested and suspended; (2) issued three notices of proposed removal; (3) subjected to a fact-finding; (4) given poor performance appraisals; (5) assigned menial tasks; and (6) subjected to a variety of other miscellaneous allegations. (See generally Amend. Compl.)

Assuming, _arguendo_, Plaintiff is disabled as defined under the Rehabilitation Act[6] and was qualified to perform his job, Plaintiff has failed to state a _prima facie_ case of disability discrimination because he fails to show any adverse action was taken against him _because_ of his disability.  Moreover, even if Plaintiff were able to make out a _prima facie_ case, his discrimination claim fails for a second reason: Defendant provides non-discriminatory explanations for the treatment of Plaintiff, which Plaintiff cannot overcome given the absence of evidence upon which a reasonable jury could find Defendant's proffered reasons were pretextual.

A.   Arrest, Suspension, Notices of Proposed Removal and Fact-Finding

Plaintiff claims Defendant discriminated against him when, on March 30, 2017, Mr. Foerst had him arrested by the VA police resulting in the issuance of a notice of proposed removal and, ultimately, his two-week suspension.  However, Defendant

---

[6]  Defendant also argues Plaintiff's supervisors were unaware of Plaintiff's service-related disability, having knowledge of Plaintiff's work-related injury only.  (Def. Motion at 9.) Defendant further claims Plaintiff's work-related injury is merely a transitory injury and not a Rehabilitation Act disability.  (_Id._) Plaintiff contests this point claiming, because his work-related injury required him to be placed on light-duty status for 18 months, said injury cannot be considered transitory.  (Pl. Opp'n at 112-113; Pl. Reply at 4.)  Since it finds Plaintiff fails to demonstrate a _prima facie_ case of discrimination under the Rehabilitation Act and Defendant offers legitimate, nondiscriminatory reasons for the VA's actions, the Court need not consider this issue.

offers legitimate non-discriminatory reasons for having Plaintiff arrested.  At the time of his arrest, Mr. Foerst observed Plaintiff place a box of VA supplies into a contractor's truck.  (Def. 56.1 Stmt. ¶ 40.)  Given this observation in conjunction with the fact that, a few months prior, a $300 air gun had gone missing (id. ¶ 35), Mr. Foerst believed Plaintiff was stealing.  Plaintiff even admitted, "I think [Mr. Foerst] called the police because he thought I was stealing paper towels."  (See Pl. Dep. 61:2-13, Pl. Ex. B.)  Thus, Mr. Foerst, had a legitimate nondiscriminatory reason to call the VA police, have Plaintiff arrested, issue a notice of proposed removal and, ultimately, suspend him.[7]

---

[7]  The Court notes it is of no consequence to an employment discrimination claim whether the results of a defendant-employer's investigation of alleged wrongdoing by a plaintiff-employee are correct; rather, what matters is whether the investigation was launched as a pretextual means to improperly discriminate against the plaintiff-employee.  See, e.g., Klein v. Brookhaven Health Care Facility, No. 17-CV-4841, 2023 WL 6619377, at *5-6 (E.D.N.Y. Oct. 11, 2023) (over plaintiff's objections that defendant-employers' investigation of him was flawed, adopting report and recommendation finding defendants' non-discriminatory reasons for terminating plaintiff withstood plaintiff's claims of pretext due to the absence of evidence that defendants' investigation of plaintiff was launched as a pretextual means of terminating plaintiff's employment for discriminatory reasons); see generally McPherson v. N.Y.C. Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case, however, we are decidedly no interested in the truth of the allegations against plaintiff.  We are interest in what motivated the employer . . . ; the factual validity of the underlying imputation against the employee is not at issue."); Wade v. N.Y.C. Dep't of Educ., 667 F. App'x 311 (2d Cir. 2016) (explaining the truth of the allegations against employee resulting in termination are immaterial).

In trying to raise an inference of discrimination, Plaintiff compares his treatment to that of another EMS employee, Robert, also accused of theft in 2017, but who was not arrested. (Pl. Opp'n at 98-99.)  Plaintiff's comparison to Robert is inapt. First, Robert received a notice of proposed removal for "failure to follow instructions" when he used his personal vehicle while on duty and for "unauthorized possession" for pumping government gas into his personal vehicle.  (Id. at 98; see Pl. Ex. N.)  Contrary to Plaintiff, Robert apologized for his actions and explained he was unaware that he could not use his personal vehicle with government gas to perform government work.  (See Pl. Ex. N at 6.) Thus, "the context and circumstances" of Robert's alleged violation were "sufficiently different" from Plaintiff's "to preclude a finding that they were similarly situated." Conway v. Microsoft Corp., 414 F. Supp. 2d 450, 464 (S.D.N.Y. 2006) (citing cases); see also, e.g., Pierce v. Netzel, No. 98-CV-532A(F), 2004 WL 1055959, at *13 (W.D.N.Y. May 10, 2004) ("For an employee to be 'similarly situated' for the purpose of establishing disparate treatment in an employment discrimination case, the individual as to whom the plaintiff attempts to draw a comparison must be similarly situated in all material respects, such as . . . engaging in conduct similar to the plaintiff without any differentiating or mitigating circumstances that would distinguish their conduct or

the appropriate discipline for it.") (citing <u>Shumway v. United Parcel Service, Inc.</u>, 118 F.3d 60, 64 (2d Cir. 1997)).

Additionally, Plaintiff offers no evidence--or even claims--Robert is not disabled. Instead, he merely states "Defendant did not identify [Robert] as having EEO activity or making a request for a reasonable accommodation." (Pl. Opp'n at 99.)[8] Upon these facts, no reasonable juror could find Defendant treated non-disabled employees more favorably than Plaintiff. It is well-established that, without more, a plaintiff's subjective belief he was discriminated against based on his membership in a protected class is insufficient to sustain a claim of discrimination. <u>See, e.g.</u>, <u>Moore v. Kingsbrook Jewish Medical Center</u>, No. 11-CV-3625, 2013 WL 3968748, at *6-7 (E.D.N.Y. July 30, 2013) (finding plaintiff's belief he was discriminated against based upon his national origin insufficient to survive summary judgment).

Likewise, the issuance of Plaintiff's October 24, 2017 notice of proposed removal was based on legitimate non-discriminatory reasons. Admittedly, while working as a courier, Plaintiff refused to deliver supplies and misdelivered

---

[8] In a footnote in his Reply, Plaintiff states his "belie[f] that Robert . . . was not disabled and not on light duty." (Pl. Reply at 9 n.6.) However, Plaintiff has offered no proof of Robert's disability status, and Defendant does not maintain records regarding the disability status of its employees. (<u>See</u> Def. Reply at 7 n.4.)

medications.   (Def. 56.1 Stmt. ¶¶ 101, 109-110; Pl. Dep. 142:19-143:2; see also Def. Ex. 17 (Oct. 12, 2017 email stating: "[Plaintiff], who is being sent to the CB[]Cs to pick up the samples and deliver mail adamantly refused to take the boxes of supplies because 'it is not in [his job description]'").) "Unsatisfactory job performance is a legitimate nondiscriminatory ground for discipline." Mark v. Brookdale Univ. Hosp., No. 04-CV-2497, 2005 WL 1521185, at *27 (E.D.N.Y. June 22, 2005).

Attempting to argue pretext, Plaintiff claims he was never trained for the courier role. (Pl. Opp'n at 15-16.) However, Plaintiff also testified: there was no training for the courier role; he told the CBCs that it was not in his job description to deliver supplies; and, he later found out such deliveries were part of his job. (Pl. Dep. 125:11-21, 135:14-136:12.)   Further, even after the issuance of the October 2017 notice of proposed removal, Plaintiff's supervisors continued hearing complaints from numerous CBC staff members that Plaintiff was refusing to help with certain deliveries.  For example, in a November 3, 2017 email to Plaintiff's supervisors, a VA employee complained "the courier commented that it wasn't his job" with respect to the delivery of paper. (Def. Ex. 19.)  Thus, Plaintiff fails to demonstrate Defendant's reasons for issuing Plaintiff's notice of proposed removal were pretextual and meant to mask illegal discrimination.   In any event, on November 16, 2017,

24

Plaintiff's notice of proposed removal was reduced to a letter of reprimand (Pl. 56.1 ¶ 86); however, "[a] mere threat of discipline is not an adverse employment action." Bowen-Hooks v. City of N.Y., 13 F. Supp. 3d 179, 212 (E.D.N.Y. 2014) (citing Uddin v. City of N.Y., 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006) ("[C]ourts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." (quoting Honey v. County of Rockland, 200 F. Supp. 2d 311, 320 (S.D.N.Y. 2002))).

Finally, Plaintiff's reference to a fact-finding in late 2017 or early 2018 fails to show discrimination.  By his own testimony, Plaintiff was subjected to a fact-finding, not due to discrimination, but because he had forgotten to pick up nail clippers for one of the CBC's podiatry patients. (Pl. Dep. 146:16-150:10.) Plaintiff further testified: after sitting with his union representative and Ms. Cassidy for a fact-finding, he was not disciplined for the incident; and, "Ms. Baker Cassidy didn't make anything of it and, essentially, just let it go." (Id. 148:25-150:10.)  Thus, like a reprimand, the mere threat of discipline via a fact-finding is not an adverse action for purposes of a discrimination claim.   See Bowen, 13 F. Supp. 3d at 212.

In sum, as with his arrest and suspension, by relying upon the notices he received, Plaintiff has not presented any

evidence creating a genuine issue of material fact that, with respect to his being disciplined, any individual involved in such decisions was motivated by impermissible discriminatory intent.

B.   <u>Performance Appraisals</u>

Plaintiff's contention that his negative performance appraisals were based on discriminatory animus cannot survive summary judgment for two reasons.   First, standing alone, "a negative performance review, without any showing of a negative ramification, cannot constitute an adverse employment action." <u>Natofsky v. City of N.Y.</u>, 921 F.3d 337, 352 (2d Cir. 2019); <u>see also</u> <u>Walder v. White Plains Bd. of Educ.</u>, 738 F. Supp. 2d 483, 499 (S.D.N.Y. 2010) ("[N]egative evaluations alone, without any accompanying adverse consequences, such as a demotion, diminution of wages, or other tangible loss, do not constitute adverse employment actions.").   Plaintiff fails to point to any specific adverse consequences he suffered as a result of his performance evaluations; therefore, any lower performance evaluation does not constitute an adverse employment action.

Second and notably, Plaintiff did not actually receive a negative performance evaluation; instead, he received a lower successful rating than he had in the past.   Though, in September 2017, Mr. Foerst initially rated Plaintiff "unacceptable" and "minimally satisfactory", Ms. Cassidy changed his rating to "fully successful".   (Def. Ex. 14.)   Plaintiff argues that, prior to 2017,

he had consistently received "excellent" or "outstanding" performance reviews, but after 2017, he was rated only "fully successful", which is the lowest "successful rating". (See Pl. 56.1 Response ¶ 125.)  However, "the Court cannot characterize a positive evaluation as a negative one based solely on Plaintiff's belief that the evaluation should have been higher than it was." Bowen-Hooks, 13 F. Supp. 3d at 225.

Nonetheless, Defendant offers a legitimate non-discriminatory reason for Plaintiff's lower performance rating:  In 2018, the Acting Associate Director of the Northport VA complained of too many employees being rated "outstanding" on their performance reviews; as a result, therefore, Plaintiff's supervisors saved "outstanding" reviews for employees only who performed above and beyond their job responsibilities. (Def. 56.1 Stmt. ¶¶ 126, 128.)  Moreover, record evidence demonstrates other employees were upset they were no longer receiving "outstanding" performance reviews. (Id.)  Thus, even if, arguendo, Plaintiff's performance evaluations could be considered adverse actions, the evidence shows Plaintiff's performance evaluations were not caused by discriminatory animus but, rather, the result of the changed VA policy.  Indeed, Plaintiff testified he had no reason to believe the directive to limit the issuance of "outstanding" performance evaluations was untrue. (Pl. Dep. 177:24-178:23.)

Hence, Plaintiff's reliance upon the performance appraisals is unavailing. By them, Plaintiff cannot meet his burden of showing Defendant's proffered legitimate explanation for his lower performance appraisals was a pretext for discrimination. See Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (explaining a plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action" (internal quotation marks, brackets, and citation omitted)).

C.   Assignment of Menial Tasks

Plaintiff alleges that when he was reassigned to work under Ms. Cassidy following his March 30, 2017 arrest, he was subject to discrimination by being "assigned menial tasks, including washing wheelchairs, cleaning the bathrooms with what was essentially a toothbrush, cleaning elevators, and picking up garbage along the side of the road." (Pl.'s Response to Interrogs., Def. Ex. 2.) However, "simply being assigned undesirable work duties . . . [is] insufficient to establish adverse employment action, since they do not have a material impact on the terms and conditions of plaintiff's employment." Figueroa v. N.Y.C. Health and Hosps. Corp., No. 03-CV-9589, 2007 WL 2274253, at *4 (S.D.N.Y. August 7, 2007). For an employer's action to be

"materially adverse with respect to the terms and conditions of employment," it must be "more disruptive than a mere inconvenience or an alteration of job responsibilities" <u>Davis v. N.Y.C. Dep't of Educ.</u>, 804 F.3d 231, 235 (2d Cir. 2015) (internal quotation marks omitted)).  Notably, the collective bargaining agreement to which Plaintiff was subject allowed Plaintiff to be assigned tasks below, but not above, his pay grade.  (Def. 56.1 Stmt. ¶¶ 71-72.)

Moreover, any argument that such work assignments occurred under circumstances giving rise to an inference of discrimination is belied by Plaintiff's own testimony.  He stated he never complained to any of his supervisors about the tasks to which he was assigned.  (Pl. Dep. 87:8-14.)  Plaintiff also testified cleaning "the bathrooms of our veterans" is a "necessary job".  (Pl. Dep. 88:11-20.)  He further explained: the brush he was given to clean the bathrooms was a small wire brush used to clean grout lines; and, at all times, he had access to other cleaning supplies.  (<u>Id.</u> 84:16-23; 85:15-18.)

Similarly, Plaintiff's claim that following his suspension, he was required to remove poison ivy by hand and wash dishes, fails to support a discrimination claim.  (<u>See</u> Def. Ex. 2 at 8.)  First, Plaintiff acknowledged removing poison ivy was a task usually performed by the Grounds Department staff.  (Pl. Dep. 112:24-113:3.)  Further, the record shows Plaintiff was sent to the VA's Nutrition and Food Department for an interview to

determine whether there was a role he could serve there which would accommodate his light-duty restrictions.   (Pl. Ex. C at 72-74.) Plaintiff was not interested and declined. (Id. at 73.)

In any event, Plaintiff offers no evidence demonstrating the assignment of any of these tasks in any manner related to his disability.   Thus, Plaintiff has not established a prima facie case of discrimination on this basis.

D.   Miscellaneous Allegations

The remainder of Plaintiff's allegations of discriminatory conduct are wholly conclusory and unsupported by any evidence.[9]   A plaintiff "cannot rely solely on conclusory allegations of discrimination without any concrete evidence to support h[is] claims."   Brown v. Northrop Grumman Corp., No. 12-CV-1488, 2014 WL 4175795, at *11 (E.D.N.Y. Aug. 19, 2014) (citations omitted); see also Tutko v. James River Paper Co., Inc., No. 98-CV-9663, 1999 WL 1024627, at *2 (2d Cir. 1999) ("Summary judgment against a plaintiff in an employment discrimination case is appropriate if the plaintiff offers only unsupported

---

[9]   Plaintiff claims he was charged leave without pay ("LWOP") on several occasions even though he had sufficient annual leave. (Pl. 56.1 Response ¶¶ 134-36.)   However, Plaintiff testified there had been no instances where he was charged leave without pay.   (Pl. Dep. 166:16-19.)   Instead, Plaintiff explained, at one point, there had been a computer glitch which initially charged him LWOP, but the error was corrected minutes later and that Mr. Foerst subsequently apologized for the resulting confusion caused by same.   (Id. 164:16-165:16.)

assertions, conjecture or surmise, or conclusory statements to support an essential element of his case." (internal quotations omitted; citation omitted)).

For example, Plaintiff contends that following his December 2016 work-related injury, Mr. Foerst commented on his light-duty status in front of his co-workers. (Pl. Dep. 32:2-39:12.) Yet, as Plaintiff's supervisor, Mr. Foerst would need to know the status of his employees in order to accommodate them. (Id. 38:4-9 ("[A]s a supervisor, obviously, [Mr. Foerst] would need to know what my status is. So[,] I don't mean to say it's not his business and that's not what I mean.").) In a May 9, 2017 affidavit submitted by Mr. Foerst in Plaintiff's EEO case, Mr. Foerst explains that, during a morning staff meeting, he asked both Plaintiff and another employee about their respective light-duty statuses. (Def. Ex. 4.) Plaintiff responded he planned to stay on light-duty indefinitely, to which Mr. Foerst replied, "[T]hat's fine, do what you have to do to get better. Don't push yourself, only do what you feel you are capable of doing." (Id.; see also Ex. C at 12.) Wholly missing from the record is any evidence Mr. Foerst demonstrated any discriminatory animus toward Plaintiff based on his light-duty status.

Similarly, Plaintiff's claim that, sometime after he was put on light-duty status, he was no longer permitted to use VA pickup trucks to complete his daily assignments fails to show

discrimination. (Def. Ex. 2 at 5.) Mr. Forest explained, and Plaintiff did not contest, that at some point in 2017, he instituted a change in policy for all Grounds Department employees which required them to use golf carts instead of pickup trucks to get around the campus. (Pl. Ex. 20 (Foerst Aff.).) Though Plaintiff claims he observed other Grounds Department employees utilizing VA pickup trucks during this time, without more, this is insufficient to create a genuine issue of material fact with respect to discriminatory intent.

Likewise, Plaintiff's contention that in Winter 2018 or 2019, Mr. Foerst refused to purchase Plaintiff new work clothes, as he did for the other Grounds Department employees, is insufficient to create a genuine issue of fact regarding discriminatory intent. Mr. Foerst explained that, as a courier, Plaintiff did not need the protective clothing the Grounds Department staff working outside required; moreover, yearly, Plaintiff was provided a new pair of work boots. (Def. Ex. 21 (Foerst Aff.) ¶ 19.) Though Plaintiff claims Mr. Foerst purchased clothing for other employees not in his Department and who did not work outside (Pl. 56.1 Response ¶ 140.), Plaintiff offers no evidence from which to infer Mr. Foerst acted with discriminatory intent. "[T]he mere fact that an individual is a member of a protected class cannot compel the conclusion—or even the inference—that any action taken with respect to that individual is

taken <u>because</u> of the characteristic that renders him a member of such a class." <u>Castro v. City of N.Y.</u>, 24 F. Supp. 3d 250, 265 (E.D.N.Y. 2014) (emphasis in original).

Even assuming, <u>arguendo</u>, Plaintiff was targeted by Mr. Foerst, Plaintiff "has not shown that such treatment occurred because of [his disability], which is a <u>sine qua non</u> for [a] discrimination claim." <u>Lorenz v. Erie Cmty. Coll.</u>, No. 14-CV-0210, 2018 WL 2939492, at *4 (W.D.N.Y. June 12, 2018) (quoting <u>Weichman v. Chubb & Son</u>, 552 F. Supp. 2d 271, 286 (D. Conn. 2008)). "Plaintiff[']s feelings and beliefs are no[] substitute for persuasive evidence that identifiable, valid comparators were treated in a meaningfully different manner." <u>Polo v. Xerox Corp.</u>, No. 10-CV-6288, 2014 WL 317171, at *5 (W.D.N.Y. Jan. 28, 2014) (internal quotation marks omitted; brackets added); <u>Bethea v. JP Morgan Chase & Co.</u>, No. 15-CV-3544, 2019 WL 4805141, at *8 (E.D.N.Y. Sept. 30, 2019) ("[A] plaintiff's mere subjective belief that he was discriminated against because of his [protected characteristics] does not sustain a . . . discrimination claim.") (internal quotations omitted).

In short, upon the summary judgment record presented, no reasonable juror could find a basis upon which to infer discriminatory animus. <u>See, e.g.</u>, <u>Falso v. SPG Direct</u>, 353 F. App'x 662, 664 (2d Cir. 2009) (affirming summary judgment where plaintiff failed to show adverse action occurred because of his

disability).    Therefore,  Defendant's  Motion  seeking  summary judgment on Plaintiff's discrimination claim is GRANTED.

III. <u>Retaliation Claim</u>

Plaintiff  also  alleges  a  retaliation  claim  under  the Rehabilitation  Act  on  the  basis  that  he  suffered  reprisal  for requesting a reasonable accommodation for his work-related injury and for filing two EEO complaints. (<u>See</u> Pl. Opp'n at 92; Pl. Reply at  2.)   Defendant  counters  that,  like  his  discrimination  claim, Plaintiff  has  failed  to  establish  a  <u>prima  facie</u>  case  of retaliation, and, even if Plaintiff had, Defendant has articulated legitimate  non-retaliatory  reasons  for  the  challenged  actions, which Plaintiff has failed to demonstrate are pretextual.  (Def. Support Memo at 8-24.)   The Court concurs.

A.    <u>Legal Standard</u>

To  establish  a  <u>prima  facie</u>  case  of  retaliation,  a plaintiff must show "(1) participation in a protected activity; (2)  that  the  defendant  knew  of  the  protected  activity;  (3)  an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." <u>McMenemy v. City of Rochester</u>, 241 F.3d 279, 282–83 (2d Cir. 2001).[10]  "A causal  connection  in  retaliation  claims  can  be  shown  either  (1)

---

[10]   Retaliation  claims  raised  under  the  Rehabilitation  Act  are analyzed  under  the  same  general  framework  as  retaliation  claims under  Title  VII.   <u>See</u> <u>Treglia v. Town of Manlius</u>, 313 F. 3d 713, 719 (2d Cir. 2002).

indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Natofsky, 921 F.3d at 353 (internal quotations and citation omitted).

Once a prima facie case is established, retaliation claims are subject to the same burden shifting analysis as discrimination claims. See Treglia, 313 F.3d at 719. If the plaintiff successfully establishes a prima facie case of retaliation, the burden shifts to the defendant to "articulate a legitimate, non-retaliatory reason for the adverse employment action." Rasmy v. Marriott Int'l, Inc., 952 F.3d 379, 392 (2d Cir. 2020) (alteration omitted). If such a reason is articulated, the burden shifts back to the plaintiff, who must then establish that the "legitimate, non-retaliatory reason" offered by the employer is a mere pretext, and that the employer's "desire to retaliate" was the actual "but-for cause of the challenged employment action." Id. "Under the but-for standard, '[i]t is not enough that retaliation was a substantial or motivating factor in the employer's decision," but "requires that the adverse action would not have occurred in the absence of the retaliatory motive.'" De Figueroa v. New York, No. 17-CV-0436, 2022 WL 4111028, at *4

(E.D.N.Y. Sept. 8, 2022) (first quoting <u>Vega v. Hempstead Union Free Sch. Dist.</u>, 801 F.3d 72, 90-91 (2d Cir. 2015); then quoting <u>Lively v. WAFRA Inv. Advisory Grp., Inc.</u>, 6 F.4th 293, 307 (2d Cir. 2021) (internal quotation marks omitted)).  A plaintiff can meet this standard "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action."  <u>Kwan v. Andalex Grp. LLC</u>, 737 F.3d 834, 846 (2d Cir. 2013).

   B.   <u>Analysis</u>

        Here, it is undisputed Plaintiff engaged in protected activity by requesting a reasonable accommodation following his December 2016 work-related injury and by filing discrimination complaints with the EEO, first in June 2017, and then again in March 2018.  Additionally, the Court finds Defendant possessed the requisite knowledge of Plaintiff's protected activities.  <u>See Papelino v. Albany Coll. of Pharmacy of Union Univ.</u>, 633 F.3d 81, 92 (2d Cir. 2011) ("Even if the agents who carried out the adverse action did not know about the plaintiff's protected activity, the 'knowledge' requirement is met if the legal entity was on notice.")  Yet, the relevant issue is whether Plaintiff suffered an adverse action <u>because</u> of these protected activities.

        Plaintiff's position appears to be the timing of his work-related injury and his filing of the EEO complaints, which were followed by the alleged adverse actions, is sufficient to

establish his retaliation claim. (Pl's Opp'n at 97, 119, 121.) Though sufficient to demonstrate a prima facie retaliation claim, "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage." Kwan, 737 F.3d at 847 (citing El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation [ ], but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext.")[11]).

In support of his claim, Plaintiff submits email correspondence between his supervisors, all dated after his request for a reasonable accommodation and some dated after he filed his initial EEO charge. (See Pl. Ex. C.) Plaintiff argues "[t]he logical conclusion is that Mr. Foerst, as shown through the emails, his many lies, and other evidence, had an animosity toward [Plaintiff] for requesting the reasonable accommodation and for filing EEO complaints." (Pl. Opp'n at 113.) However, the email correspondence merely reflects Plaintiff's supervisors' concerns over the issues Plaintiff was having at work. For example, a March 31, 2017 email from Mr. Foerst to Mr. Markes provides:

---

[11] See also Hale v. Vidal, No. 22-2973, 2023 WL 7211909, at *1 (2d Cir. Nov. 2, 2023) (citing El Sayed for same proposition, as well as recognizing El Sayed was abrogated in part on other grounds by Univ. of Tex. Sw. Med. Ctr. V. Nassar, 570 U.S. 338 (2013)).

> It's amazing how the truth comes out when
> someone is not liked. 1. Coming on the weekend
> to take the stump grinder.  2. Coming on the
> weekend to take the paint sprayer and the
> paint to stripe parking lots for money.  3.
> Loading up his truck with housekeeping
> supplies to sell on the weekend. (Please
> instruct Allen not to give him anything in the
> future).  Just food for thought.

(Pl. Ex. C at 48.)  Then, on April 7, 2017, Mr. Markes emailed

Steven Snyder in Human Resources, stating:

> Another aspect of [Plaintiff]'s illegal
> activity was his capacity as a drug dealer to
> many. . . . [Plaintiff] was single handedly
> responsible for supplying [a former employee]
> with pills.

(Id. at 75.)  Further, April 25, 2017 emails between Plaintiff's

supervisors discuss Plaintiff's whereabouts while at work:

> Thank you Ann, knowing the way [Plaintiff]
> acts it would not surprise me if he was leaving
> at 3:40.

(Id. at 62.)  Continuing, a May 3, 2017 email Mr. Foerst to Ms.

Cassidy stated:

> Complaint has been made by a member of the
> warehouse B36 that [Plaintiff] has been
> spending a lot of time hanging out there.
> There is enough garbage along the parking lot
> tree lines to keep someone busy for years, let
> alone the next seven days.  Just a suggestion.

(Id. at 1.)  There is also Mr. Uingston's May 9, 2017 email

to Human Resources, with the subject line "EEO by JK", in

which Mr. Uingston states he spoke to Mr. Foerst about his

38

"light duty" inquiry of Plaintiff.  Mr. Uingston expressed

his belief in Mr. Foerst's explanation, stating further:

> [Plaintiff] is trying to do whatever he can to
> detract from this and I don't want to lose
> sight of it. I want the director to sustain
> the action.  He has been bad news for the
> longest.  There is no evidence that he was
> helping the contractor and to my knowledge he
> even signed a confession.  Additionally Jerry
> is adamant that he never pressured him at all
> about his light duty.  It was the total
> opposite.

(Id. at 12.)  Finally, a November 4, 2017 email from Mr. Foerst to

a number of supervisors, discussing Plaintiff's issues as a

courier, provides:

> We cannot afford to let this slip through our
> fingers again.  I do not want this poisonous
> apple around my good men, they deserve better
> for all their hard work and effort.
>
> In light of this new evidence might I
> recommend that we postpone the meeting with
> the Director on Monday 11/6/17 at 1500 HRS and
> issue a Rescind and Reissue order.  The
> Veterans that we work for do not deserve this
> type of treatment and representation from EMS,
> we are certainly better than this.

(Id. at 10-11.)

Although this series of email correspondence was after

Plaintiff's request for a reasonable accommodation and his March

30, 2017 arrest, what they demonstrate is Plaintiff was not well

liked by supervisors and fellow employees; wholly missing from

same, however, are any references to Plaintiff's disability or

anything demonstrating a retaliatory motive with respect to

Plaintiff's protected activities.   Hence, despite Plaintiff's characterization that "the emails between [his] supervisors show an open hostility toward him" (Pl. Opp'n at 16), such "personal animosity is not tantamount to retaliatory animus." Cheung v. Donahoe, No. 11-CV-0122, 2016 WL 3640683, at *11 (E.D.N.Y. June 29, 2016) (citation omitted).   Rather, "it is well-settled that [ ] the Rehabilitation Act prohibit[s] employers from retaliating against employees only where the retaliatory conduct is sparked by the employee's protected activities, and so, a showing of mere general animosity, untethered to a protected activity, fails to state a retaliation claim." Id. (collecting cases).

Furthermore, insofar as it appears Plaintiff asserts a retaliation claim based upon the same allegations addressed supra, that claim, like his discrimination claim, fails at step three of the McDonnell analysis because, after Defendant has established legitimate, non-retaliatory reasons for the alleged adverse actions of which Plaintiff complains, Plaintiff has not offered evidence showing Defendant's proffered legitimate, non-retaliatory explanations are pretextual.   To the extent Plaintiff offers Mr. Foerst's asking Plaintiff whether he had filed an EEO claim when questioning him about a missing weedwhacker in May 2017 (Pl. 56.1 Response ¶ 59), though such questioning may be considered inappropriate, without more, it is insufficient to demonstrate retaliatory animus.

Thus, as Plaintiff has provided "no other circumstantial or direct evidence to support his retaliation claim" other than temporal proximity "which alone is insufficient to defeat summary judgment at the pretext phase, . . . or to counter [Defendant's] legitimate, nonretaliatory reasons" for the alleged adverse actions, summary judgment in Defendant's favor on Plaintiff's retaliation claim is warranted. See Clark v. Coca-Cola Beverages Ne., Inc., No. 20-4040-CV, 2022 WL 92060, at *5 (2d Cir. Jan. 10, 2022) (internal citation omitted). Accordingly, the Court GRANTS Defendant's Motion seeking summary judgment on Plaintiff's retaliation claim.

## IV. Hostile Work Environment Claim

Plaintiff contends that after his December 2016 work-related injury, he was subject to a hostile working environment with respect to creating and fabricating incidents to have him removed. Defendant claims the incidents of which Plaintiff complains have no nexus to his claimed disability or protected activities and are not sufficiently severe or pervasive. (Def. Support Memo at 24.) The Court agrees with Defendant.

To prevail on a hostile work environment claim under federal law, a plaintiff must show "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to

the employer." <u>Fox v. Costco Wholesale Corp.</u>, 918 F.3d 65, 74 (2d Cir. 2019) (citation omitted).[12]   The standard for establishing a hostile work environment is high, <u>Terry v. Ashcroft</u>, 336 F.3d 128, 148 (2d Cir. 2003), and a claim cannot be based upon vague, unsupported allegations.   <u>Thomas v. Bergdorff Goodman, Inc.</u>, No. 03-CV-3066, 2004 WL 2979960, at *7 (S.D.N.Y. 2004).   Although the victim must subjectively perceive the conduct as abusive, the misconduct shown also must be "severe or pervasive enough to create an objectively hostile or abusive work environment." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993); <u>see also</u> <u>Fox</u>, 918 F.3d at 74 (same).   "Courts look to the totality of the circumstances to determine whether a plaintiff has met this burden, including proof of 'the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with [the plaintiff's] work performance.'" <u>Fox</u>, 918 F.3d at 74 (quoting <u>Harris</u>, 510 U.S. at 23).   Although hostility of a work environment is assessed considering the "totality of the circumstances," <u>Patane v. Clark</u>, 508 F.3d 106, 113 (2d Cir. 2007), "[i]t is . . . important in hostile work environment cases to exclude from consideration

---

[12]   <u>See also</u> <u>Leftridge v. N.Y.C. Dep't of Educ.</u>, No. 17-CV-7027, 2020 WL 1503665, at *11 (S.D.N.Y. Mar. 30, 2020) ("The standard for demonstrating a hostile work environment is the same under Title VII, the ADA, [and] the Rehabilitation Act.").

personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002). In other words, to succeed on his hostile work environment claim, Plaintiff must "demonstrate that []he was subjected to the hostility because of h[is] membership in a protected class." Brennan v. Metro. Opera Ass'n Inc., 192 F.3d 310, 318 (2d Cir. 1999).

Plaintiff's hostile work environment claim is based upon the same allegations as his discrimination and retaliation claims. Like those claims, Plaintiff's hostile work environment claim cannot survive summary judgment since, for the reasons discussed supra, he fails to offer any evidence demonstrating that he was "subjected to the hostility because of h[is] membership in a protected class." Brennan, 192 F.3d at 318 (emphasis added); see also, e.g., Laface v. Eastern Suffolk BOCES, No. 18-CV-1314, 2019 WL 1959489, at *2 (E.D.N.Y. May 2, 2019) (quoting Brennan for same proposition).

Moreover, the type of conduct Plaintiff asserts Defendant engaged in, i.e., negative performance evaluations and disciplinary warnings resulting from work performance, does not support a hostile work environment claim. See Salerno v. Town of Bedford, NY, No. 05-CV-7293, 2008 WL 5101185, at *8 (S.D.N.Y. Dec. 3, 2008) ("Allegations of negative job evaluations or excessive reprimands are insufficient to establish a hostile environment

claim." (citing <u>Weeks v. N.Y. State (Div. of Parole)</u>, 273 F.3d 76, 86 (2d Cir. 2001))).  Additionally, the assignment of menial tasks has been found neither severe nor pervasive enough to create a hostile work environment.  <u>See</u> <u>Ramirez v. Temin & Co., Inc.</u>, No. 20-CV-6258, 2021 WL 4392303, at *7 (S.D.N.Y. Sept. 24, 2021) (dismissing hostile work environment claim where plaintiff alleged her supervisor "belittled her by ordering her to perform menial tasks"); <u>Davis-Molina v. Port Auth. of N.Y. & N.J.</u>, No. 08-CV-7586, 2011 WL 4000997, at *11 (S.D.N.Y. Aug. 19, 2011) (finding "diminished [job] responsibilities," and an increased workload of menial tasks could not show defendant's conduct was sufficiently severe or pervasive), <u>aff'd</u>, 488 F. App'x 530 (2d Cir. 2012)); <u>cf.</u> <u>Stinson v. City Univ. of N.Y.</u>, No. 17-CV-3949, 2018 WL 2727886, at *12 (S.D.N.Y. June 6, 2018) (in context of dismissal motion, finding fatal to plaintiff's hostile work environment claim a lack of allegations that alleged harassing conduct was connected to plaintiff's disability or race).  In sum, Plaintiff fails to raise a genuine issue of fact that he suffered an objectively hostile work environment on the basis of his disability.  Therefore, the Court GRANTS Defendant's Motion seeking summary judgment on Plaintiff's hostile work environment claim.

## V.   <u>Plaintiff's Cross-Motion</u>

The Court has also considered Plaintiff's Cross-Motion on its own merits.  <u>See</u> <u>Morales v. Quintel Entrm't, Inc.</u>, 249 F.3d

115, 121 (2d Cir. 2001).  In doing so, the Court has applied the summary judgment standard articulated supra, and has drawn all reasonable inferences against Plaintiff, as the movant.  See id. (citing Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir. 1981)).  For the same reasons the Court articulated warranting granting summary judgment in Defendant's favor, i.e., Defendant sufficiently demonstrating non-discriminatory bases for the actions complained of and Plaintiff failing to offer evidence showing Defendant's stated bases were pretextual, the Court finds those reasons equally warrant denying Plaintiff summary judgment in his favor.

<u>CONCLUSION</u>

For the reasons stated herein, **IT IS HEREBY ORDERED** that:
I. Defendant's Motion (ECF No. 45) is GRANTED in its entirety; and
II. Plaintiff's Cross-Motion (ECF No. 53) is DENIED in its entirety; and

**IT IS FURTHER ORDERED**, upon entry of Judgment, the Clerk of Court is directed to CLOSE this case; thereafter, copies of this Memorandum and Order and the corresponding Judgment are to be mailed to Plaintiff at his address of record.

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    January 18, 2024
          Central Islip, New York

45